STATE OF NORTH CAROLINA v. CARLTON CORTEZ JOHNSON

No. COA02-1631

(Filed 4 November 2003)

**1. Homicide— first-degree murder—short-form indictment— constitutionality**

The short-form murder indictment used to charge defendant with first-degree murder was constitutional.

**2. Identification of Defendants— photographic identification—motion to suppress**

The trial court did not err in a double first-degree murder, second-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, robbery with a dangerous weapon, and larceny case by denying defendant's motion to suppress evidence of a witness's photo identification of defendant as the shooter, because: (1) no suggestive comments were made and this was not an instance in which the police simply showed a single photo to identify defendant; (2) the witness observed defendant firing a shotgun during the commission of the crime and gave an accurate description of defendant at the crime scene following the shooting; (3) the witness's photo identification of defendant occurred on the same day as the shooting; and (4) the accuracy of the identification was bolstered by the fact that defendant was subsequently identified as the shooter from a separate photographic lineup by one of the victims.

**3. Search and Seizure— arrest—protective sweep of home— reasonableness**

The trial court did not err in a double first-degree murder, second-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, robbery with a dangerous weapon, and larceny case by denying defendant's motion to suppress evidence seized as a result of a protective sweep of defendant's house following his arrest, because: (1) a reasonably prudent offi-

cer knowing that defendant was a suspect in very recent multiple homicides in a case involving drugs and that the weapon or weapons used might still be in the home would have believed a protective sweep was necessary in order to make sure that another individual the officers saw in the house or any other individual who may have been hiding in the house did not pose a danger to those on the arrest scene; and (2) the police officers limited their sweep to securing defendant's home and observed only those items left in plain view.

**4. Jury— panels—calling jurors in order assigned rather than randomly**

Although defendant contends the trial court erred in a double first-degree murder, second-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, robbery with a dangerous weapon, and larceny case by dividing prospective jurors into panels and then calling prospective jurors from each panel in the order in which they were assigned rather than randomly from the jury venire as a whole, this assignment of error is dismissed because: (1) defendant waived his right to appeal under N.C.G.S. § 15A-1214(a) based on his failure to follow the procedures mandated in N.C.G.S. § 15A-1211(c) for challenging the entire jury panel; and (2) although defendant asserted plain error, he failed to show that absent the violation of N.C.G.S. § 15A-1214(a) a different result probably would have been reached or that the process of selecting a jury led to a miscarriage of justice or denied defendant a fair trial.

**5. Jury— impanelment of wrong alternate juror—motion for mistrial**

The trial court did not err in a double first-degree murder, second-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, robbery with a dangerous weapon, and larceny case by failing to declare a mistrial after it was discovered that the jury had been impaneled with the wrong individual sitting as an alternate juror even though the error was not discovered until after opening statements had been presented, because: (1) the trial court re-impaneled the jury with the correct alternate seated and allowed the parties to present the opening statements to the re-impaneled jury; and (2) it is within the trial court's discretion to re-impanel a jury in order to make sure defendant's right to a jury trial is protected.

STATE v. JOHNSON

[161 N.C. App. 68 (2003)]

**6. Constitutional Law— effective assistance of counsel—con- cessions in opening statements**

>    The trial court in a double first-degree murder, second-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, robbery with a dangerous weapon, and larceny case did not fail to make an adequate inquiry of defendant as to whether he intelligently and knowingly consented to his attor- ney's concessions in opening statements that defendant caused the deaths of three people, because although the better practice would be for defense counsel to make a record of a defendant's consent to concessions or admissions of guilt prior to making those concessions, on the unique facts of this case the trial court's inquiry was adequate to establish that defendant had pre- viously consented to his counsel's concession.

Appeal by defendant from judgments entered 8 March 2002 by Judge B. Craig Ellis in Cumberland County Superior Court. Heard in the Court of Appeals 18 September 2003.

> *Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Norma S. Harrell, for the State.*

> *Margaret Creasy Ciardella for defendant-appellant.*

HUNTER, Judge.

Carlton Cortez Johnson ("defendant") appeals from judgments dated 8 March 2002 entered consistent with a jury verdict finding him guilty of two counts of first degree murder, one count of second degree murder, one count of assault with a deadly weapon with intent to kill inflicting serious injury, one count of robbery with a dangerous weapon, and one count of larceny. We conclude there was no reversible error at trial.

The State presented evidence tending to show defendant shot and killed three men, wounded another, and stole drugs and money at a house used for the sale and consumption of illegal drugs. Terry McClelland ("McClelland") was present at the scene and had spent the day with the men who were shot. McClelland was in the bathroom at the time the incident began, but overheard the first shooting and hid in a closet from where he witnessed defendant shoot the remain- ing three men with a shotgun.

After defendant fled the scene, McClelland called the police. McClelland did not initially give police the name of the shooter but

STATE v. JOHNSON

[161 N.C. App. 68 (2003)]

described him as a black male with dreadlocks and "bug eyes." McClelland then fell asleep in a police cruiser. After waking up, McClelland talked with Stephanie Croom ("Croom"), a female friend, telling her that the shooter was an individual named "Cortez" with whom McClelland had gone to school. McClelland was taken to the police station and was initially shown a six-person photographic lineup, including defendant's brother, but was unable to identify anyone. After this, McClelland was shown approximately sixty more photos on a computer of people matching the description he had given to police. Eventually, based on the name he had given, McClelland was shown a photograph of defendant. The photograph was folded in such a way to hide defendant's name. McClelland was asked if he recognized the photograph and upon seeing it stated "that's him" and began crying and shaking. Deva Hill, one of the victims of the shooting, subsequently identified defendant as the shooter from a photographic lineup, and Croom also identified defendant from a photograph.

Based on McClelland's identification, the police obtained an arrest warrant for defendant. The police went to defendant's residence where defendant answered the door. Defendant was immediately pulled outside, placed on the ground, and arrested. A second individual was seen inside the residence, and the police performed a protective sweep of the residence in which they detained the second individual. During this sweep, the police observed a shotgun at the foot of a bed, a revolver by a couch, money, and a bag of marijuana. A search warrant eventually arrived and these and other items were seized. Prior to trial, defendant moved to suppress both McClelland's identification and items found during the protective sweep of defendant's residence after his arrest, and this motion was denied.

During jury selection in open court, the trial court divided the jury panel into six separate panels of twelve jurors each. The trial court then called each prospective juror from the respective panels to the box in the order in which they were placed into the panel until a jury was selected. Defendant did not object to this method of jury selection. After the jury was selected and impaneled, the parties gave opening statements. In his opening statement, defendant, through his counsel, conceded that he had caused the deaths of three people and wounded a fourth, but that he was guilty of less than first degree murder as there was no premeditation or deliberation. Following this opening statement, it was discovered that the jury had been impaneled with an incorrect alternate juror. The trial court re-impaneled the jury, with the correct alternate, and permitted the parties to repeat

their opening statements. Prior to repeating opening statements, however, the trial court inquired of defendant if he had consented to his counsel's concessions in the original opening statement, and defendant replied that he had.

The issues are whether: (I) the short-form first degree murder indictment is constitutional; (II) (A) the identification procedure used to identify defendant was impermissibly suggestive, and (B) the search of defendant's house was a lawful protective sweep; (III) the trial court's division of jurors into separate panels violated the statutory requirement of random jury selection and constituted plain error; (IV) the trial court erred by re-impaneling the jury after discovering the wrong alternate juror had been seated; and (V) the trial court made an adequate inquiry as to defendant's consent to his attorney's concessions.

I.

[1] Defendant first contends that the use of the short-form murder indictment violates his due process rights under the Fourteenth Amendment to the United States Constitution. Defendant raises this issue in order to preserve it for later review while acknowledging that the North Carolina Supreme Court has upheld the constitutionality of the short-form murder indictment. *See State v. Mitchell*, 353 N.C. 309, 328-29, 543 S.E.2d 830, 842 (2001). As such, we reject defendant's argument on this issue.

II.

Defendant also argues that the trial court erred in denying his motion to suppress evidence (A) of the photo identification of him as the shooter by McClelland, and (B) evidence seized as a result of the protective sweep of defendant's house following his arrest.

A.

[2] Whether a pretrial identification procedure is impermissibly suggestive depends on the totality of the circumstances and requires a two-part analysis. *State v. Rogers*, 355 N.C. 420, 432, 562 S.E.2d 859, 868 (2002). "First, the Court must determine whether the identification procedures were impermissibly suggestive. Second, if the procedures were impermissibly suggestive, the Court must then determine whether the procedures created a substantial likelihood of irreparable misidentification." *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684, 698 (2001) (citations omitted). "The test under the first inquiry is 'whether the totality of the circumstances reveals a pretrial proce-

dure so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice.' " *Id.* (quoting *State v. Hannah*, 312 N.C. 286, 290, 322 S.E.2d 148, 151 (1984)). In analyzing whether identification procedures are impermissibly suggestive, North Carolina courts look to various factors including: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty shown by the witness, and the time between the offense and the identification." *Rogers*, 355 N.C. at 432, 562 S.E.2d at 868 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154 (1977)).

Although, the use of a single photograph to identify a defendant has been criticized by our Courts, *see State v. Al-Bayyinah*, 356 N.C. 150, 156-57, 567 S.E.2d 120, 123-24 (2002), this case does not present that question. Here, McClelland was provided initially with a six-photo lineup, which included defendant's brother. McClelland was unable to make any identification from this lineup. Subsequently, McClelland viewed approximately sixty more photographs on a computer of individuals within the parameters of the description he gave to the police. McClelland was then shown a photograph, based on the name he provided, of defendant. The photograph was folded so defendant's name was not visible and McClelland was asked only if he recognized the photograph. No suggestive comments were made and this was not an instance in which the police simply showed the witness a single photograph.

In this case, applying the factors outlined in *Rogers*, the surrounding circumstances also revealed that McClellan observed defendant firing the shotgun during the commission of the crime and gave an accurate description of defendant at the crime scene following the shooting. Upon being shown the photograph of defendant, McClelland was certain of his identification stating "that's him" and began crying and shaking. McClelland's identification occurred on the same day as the shooting. Furthermore, the accuracy of the identification is bolstered by the fact that defendant was subsequently identified as the shooter from a separate photographic lineup by one of the victims. As such, the identification procedure used in this case was not impermissibly suggestive.

B.

[3] Defendant also contends evidence seized following his arrest based upon a protective sweep of his house should have been suppressed by the trial court.

STATE v. JOHNSON

[161 N.C. App. 68 (2003)]

> [Warrantless p]rotective sweeps of a residence performed by law enforcement officers in conjunction with an in-home arrest are reasonable if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."

*State v. Bullin,* 150 N.C. App. 631, 640, 564 S.E.2d 576, 583 (2002) (quoting *Maryland v. Buie,* 494 U.S. 325, 334, 108 L. Ed. 2d 276, 286 (1990)).

In this case, defendant was arrested as he came to the door of his house and was pulled outside by police officers. As this was occurring, at least one officer observed another individual inside the house.[1] Knowing that defendant was a suspect in a very recent multiple homicide in a case involving drugs and that the weapon or weapons used might still be in the home, a reasonably prudent officer, under these facts, would have believed a protective sweep was necessary in order to make sure that the individual in the house, or any other individual who may have been hiding in the house, did not pose a danger to those on the arrest scene. The police officers limited their sweep to securing defendant's home and observed only those items left in plain view. On these facts, the protective sweep of defendant's home following his arrest was not unreasonable, and the trial court did not err in denying the motion to suppress.

III.

**[4]** Defendant next assigns error to the trial court's dividing prospective jurors into panels and then calling prospective jurors from each panel in the order in which they were assigned, rather than randomly from the jury venire as a whole.

N.C. Gen. Stat. § 15A-1214(a) provides an unambiguous procedure for the selection of jurors in a criminal case. *See* N.C. Gen. Stat. § 15A-1214(a) (2001). It requires that "[t]he clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." *Id.* The jury selection method used in this case, by dividing the jury panel up into separate panels and calling the prospective jurors such that both parties knew exactly which prospective juror was next to be called is clearly in violation of Section 15A-1214(a).

---

1. This individual was, in fact, detained in the house.

STATE v. JOHNSON

[161 N.C. App. 68 (2003)]

Defendant, however, concedes that he failed to object to the method of jury selection. Nevertheless, "[w]hen a trial court acts contrary to a statutory mandate, the right to appeal the [trial] court's action is preserved, notwithstanding the failure of the appealing party to object at trial." *State v. Jones*, 336 N.C. 490, 497, 445 S.E.2d 23, 26 (1994). Section 15A-1214(a), requiring a random jury selection process, is unquestionably a statutory mandate and, as such, defendant's right to appeal the statutory violation would normally be preserved, even absent an objection. In failing to object at all, however, defendant also did not follow the procedures outlined in Section 15A-1211(c) for challenging the jury panel. Section 15A-1211(c) provides that either the State or a defendant may challenge the jury panel and that a challenge to the jury panel:

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

N.C. Gen. Stat. § 15A-1211(c) (2001). Although Section 15A-1211(c), by its language, would appear to only apply to challenges to the selection of an entire jury panel, *see id.*, and not the method in which individual jurors are called and selected, which is governed by Section 15A-1214, our Supreme Court has held that failure to follow the procedures mandated in Section 15A-1211(c) for challenging the entire jury panel waives appellate review of assignments of error under Section 15A-1214(a). *See, e.g., State v. Wiley*, 355 N.C. 592, 606-07, 565 S.E.2d 22, 34-35 (2002); *State v. Cummings*, 353 N.C. 281, 292, 543 S.E.2d 849, 856 (2001); *State v. Golphin*, 352 N.C. 364, 411-12, 533 S.E.2d 168, 202 (2000). As we are bound by the precedent set by our Supreme Court, we are required to hold that defendant has thus waived his right to appeal this issue. *See State v. Parker*, 140 N.C. App. 169, 172, 539 S.E.2d 656, 659 (2000). Furthermore, although defendant has asserted plain error he has failed to show that absent the violation of Section 15A-1214(a) a different result probably would have been reached, or that the process of selecting a jury led to a miscarriage of justice or denied defendant a fair trial. *See State v. Anderson*, 355 N.C. 136, 142, 558 S.E.2d 87, 92 (2002) (when asserting plain error, defendant bears the burden of showing absent error a different result probably would have been reached, or that error was so

fundamental that it resulted in a miscarriage of justice or denial of a fair trial).

## IV.

**[5]** Defendant further argues that the trial court erred in failing to declare a mistrial after it was discovered that the jury had been impaneled with the wrong individual sitting as an alternate juror. The incorrect alternate had actually been removed through a peremptory challenge by defendant. The error was not discovered until after opening statements had been presented. Rather than declare a mistrial, the trial court instead re-impaneled the jury with the correct alternate seated and allowed the parties to present the opening statements to the re-impaneled jury.

A trial court has the discretion, even after impanelment of a jury, to reopen examination of a juror and excuse that juror upon challenge, whether for cause or peremptory as a product of its " 'power to closely regulate and supervise the selection of the jury to the end that both the defendant and the State may receive a fair trial before an impartial jury.' " *State v. Kirkman*, 293 N.C. 447, 453-54, 238 S.E.2d 456, 460 (1977) (quoting *State v. McKenna*, 289 N.C. 668, 679, 224 S.E.2d 537, 545 (1976)). This discretion is not terminated at the impanelment of the jury. *Id.* Therefore, when appropriate, it is within the trial court's discretion to re-impanel a jury in order to make sure defendant's right to a jury trial is protected. *See id.* Thus, in this case the trial court did not err in re-impaneling the jury to insure the correct jury was impaneled.

## V.

**[6]** Defendant finally contends that the trial court failed to make an adequate inquiry of him as to whether he intelligently and knowingly consented to his attorney's concessions in opening statements that defendant caused the deaths of three people.

Where counsel for a defendant concedes his client's guilt to the offense charged or a lesser included offense without his client's consent, it is ineffective assistance of counsel *per se*. *See State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507-08 (1985). In order to ensure that a defendant has consented to his counsel's concessions of guilt, a trial court must make an inquiry "adequate to establish that defendant consented to the admissions made later by counsel during trial." *State v. Berry*, 356 N.C. 490, 514, 573 S.E.2d 132, 148 (2002). The North Carolina Supreme Court has, however, "urged 'both the bar

and the trial bench to be diligent in making a full record of a defendant's consent when a *Harbison* issue arises at trial.' " *Id.* (quoting *State v. House*, 340 N.C. 187, 197, 456 S.E.2d 292, 297 (1995)).

In this case, during his opening statement to the first impaneled jury, defendant through his counsel conceded that he "caused the deaths of three people and wounded another," but had not done so with premeditation or deliberation, but was instead in a highly intoxicated state having gone to the house with the intention to buy more drugs, that things went terribly wrong and defendant "erupted in a spontaneous manner when he committed these crimes." In concluding his opening statement, defendant's counsel requested the jury to "come back with a verdict of guilty of less than first degree murder."

Following defendant's statement, it was revealed that the trial court had impaneled the jury with an incorrect alternate. Prior to permitting the parties to again present opening statements to the properly impaneled jury, the State noted the propriety of a *Harbison* inquiry regarding defendant's opening statement. Defendant's counsel stated that defendant was prepared to admit that he had consented to tell the jurors he was present at the crime and fired the shots, but that he did so while intoxicated and in a manner constituting less than first degree murder. The trial court then addressed defendant directly:

THE COURT: . . . [Y]ou have heard what [defense counsel] just said. Have ya'll previously discussed that before he made his opening statements?

THE DEFENDANT: Yes, sir, we did.

THE COURT: And did he have your permission and authority to make that opening statement to the jury?

THE DEFENDANT: Yes, sir, he did.

THE COURT: You consent to that now?

THE DEFENDANT: Yes, sir.

Although the better practice would be for defense counsel to make a record of a defendant's consent to concessions or admissions of guilt prior to making those concessions, *see id.*, on the unique facts of this case we conclude that the trial court's inquiry was adequate to establish that defendant had previously consented to his counsel's

concession that he was present and had fired the shots that killed three people and wounded a fourth.

Accordingly, we conclude there was no reversible error.

No error.

Judges McGEE and CALABRIA concur.