HUNTER, Judge.
 

 Courie Angelo Whitfield ("defendant") appeals from a judgment filed 30 January 2003 entered consistent with a jury verdict finding him guilty of robbery with a dangerous weapon. Defendant was sentenced to a minimum prison term of sixty-four months with a corresponding maximum term of eighty-six months. For the reasons stated herein, we conclude there was no error at trial.
 

 The State's evidence tends to show the following. On the evening of 17 November 2001, two armed men robbed the Pizza Hut restaurant located on Guilford College Road in Greensboro, North Carolina. Jonathan Bozarth ("Bozarth") was one of the restaurant managers on duty that evening. He testified that the taller of the two robbers was wearing dark pants, a dark coat, and a dark "skitype" mask made of material no thinner than panty hose but not any thicker than a pullover and carrying a gun. Bozarth was taking an order over the phone and the two robbers demanded that he "get off the phone," while the taller robber held his gun to Bozarth's head. Bozarth held out the telephone so the robbers could take it. As the taller of the two robbers reached out for the phone, the jacket the robber was wearing brushed against Bozarth's arm. Bozarth was wearing a short sleeved shirt and could feel the jacket on his skin. Bozarth described the feel of the jacket as "[s]oft, fleecie [sic], almost cottony material." At trial, Bozarth identified a jacket marked as State's Exhibit 2 as the jacket the tall robber was wearing.
 

 After the robbery, the two robbers fled through the back of the restaurant, and Anthony Robinson, another restaurant manager followed them. Bozarth called 911 and Greensboro police officers responded to the call. In a written statement to police, Bozarth described the taller robber as being six-feet two-inches to six-feet three-inches tall.
 

 Officer John E. Morris, III ("Officer Morris") of the Greensboro Police Department was on routine patrol the night of the robbery when he observed two men, one tall, one short, dressed in dark clothes at some dumpsters behind the Pizza Hut restaurant on Guilford College Road. The area was well-lit and Officer Morris could see the two men clearly. The two men began running through a wooded area up a slope in Officer Morris' general direction. His suspicion aroused, Officer Morris moved to intercept the men at thetop of the slope. Officer Morris saw one of the men, whom he recognized as one of the two men seen running into the woods wearing a rolled up stocking toboggan. The man was about six-feet two-inches tall and had a thin moustache. In addition, the man was wearing a dark three-quarter length coat, which Officer Morris identified as State's Exhibit 2. Officer Morris asked the man, "[w]hat are you running for?" to which the man responded he was not running but then ran away into another wooded area. Just then, Officer Morris received a call that the Pizza Hut restaurant had been robbed, and almost immediately after, Anthony Robinson ran out of the woods and told Officer Morris that the restaurant had been robbed. At trial, Officer Morris identified defendant as the man he had intercepted running from the back of the Pizza Hut.
 

 After calling for backup, Officer Morris more closely observed his surroundings and noticed two cars parked end to end in an alley. One was a tan Toyota Camry. The second was a burgundy Nissan Sentra. Afifah Dupass ("Dupass") was sitting in the passenger seat of the burgundy car.
 

 Dupass testified that she was on a dinner date with defendant when he received what appeared to be an urgent page. Defendant was driving a burgundy car and he drove to an alley by a wooded area where he parked facing a tan car. Defendant and the driver of the tan car, who was shorter than defendant, went into the woods in the direction of Guilford College Road. Defendant was wearing the same jacket identified in court by Bozarth and Officer Morris. Shortlyafter, Dupass observed the shorter man return, put something in the trunk of the tan car and run away.
 

 Officer Scott M. Russell ("Officer Russell") of the Greensboro Police Department was on his way to assist Officer Morris when he received the call that the Pizza Hut had been robbed. Officer Russell stopped to form a perimeter a few blocks from the Pizza Hut. While he was maintaining a look-out for the robbers, Officer Russell observed a taxi cab pull into a nearby restaurant and leave shortly after, apparently without a passenger. Based on his experience patrolling the area, Officer Russell found this to be a strange occurrence and elected to perform an investigatory stop of the taxi cab. After initiating the traffic stop, Officer Russell saw someone's head appear in the back seat of the cab. When he asked the taxi driver to step out of the cab, Officer Russell observed the man in the back pick up a newspaper and begin reading. Officer Russell identified the passenger as defendant.
 

 While defendant was sitting in the back of the cab, Officer Russell asked him about his recent whereabouts and his activities. Officer Russell also observed a dark coat lying on the floor of the cab. Defendant denied the coat was his, but the taxi driver stated the coat had not previously been in the cab. Subsequently, Officer Russell asked defendant to sit in the back of the patrol car while he investigated a robbery at the Pizza Hut, to which defendant agreed. Defendant was not, however, placed under arrest. Officer Russell testified at trial, over defendant's objection, thatdefendant was cooperative, explaining that "I just know [defendant] from the past, and once that he remembered who I was . . . he was very cooperative."
 

 Both Officer Morris and Bozarth came to the scene where defendant was sitting in Officer Russell's patrol car. Officer Morris identified defendant as one of the men he saw running from the Pizza Hut. Bozarth was unable to positively identify defendant, but noted that defendant generally matched the height and build of the taller robber. Bozarth asked if he could see some of defendant's clothing, and Officer Russell produced the coat, which Bozarth identified as having been worn by the taller robber based on its feel, color, and style. Defendant's motion to suppress the evidence of this "show-up" identification by Bozarth was denied.
 

 Following the identification of the coat by Bozarth, and of defendant by Officer Morris, defendant was placed in the back of a patrol car. Over defendant's objection, Officer Russell stated that when he had asked defendant his recent whereabouts, defendant had responded that he had spent the evening in a restaurant. Based on this response, Officer Russell drove defendant to that restaurant in order to investigate defendant's alibi and concluded it was false. Defendant was subsequently arrested and charged with the robbery. Re-direct testimony clarified that Officer Russell had actually questioned defendant as to his whereabouts before he placed defendant in the patrol car. A K-9 search beginning from where the tan and burgundy cars had been parked along the wooded path where Officer Morris had observed defendant running revealed several five dollar bills and a silver handgun, which was identified by Bozarth based on its size, make, and shininess as the one used during the robbery.
 

 The issues presented on appeal are whether: (I) the procedures used in the "show-up" identification by Bozarth were impermissibly suggestive; (II) Officer Russell violated defendant's
 
 Miranda
 
 rights by questioning him as to his whereabouts on the evening of the robbery; (III) the trial court erred in allowing testimony that Officer Russell knew defendant "from the past"; and, (IV) there was sufficient evidence identifying defendant as one of the robbers to survive a motion to dismiss.
 

 I.
 

 Defendant first contends that the procedures used in the pre-trial "show-up" identification in order to elicit Bozarth's identification on the night of the robbery were impermissibly suggestive in violation of defendant's constitutional due process rights.
 
 [1]
 
 We disagree.
 

 "Whether a pretrial identification procedure is impermissibly suggestive depends on the totality of the circumstances and requires a two-part analysis."
 
 State v. Johnson,
 

 161 N.C. App. 68
 
 , 72,
 
 587 S.E.2d 445
 
 , 448 (2003). "'First, the Court must determine whether the identification procedures were impermissiblysuggestive. Second, if the procedures were impermissibly suggestive, the Court must then determine whether the procedures created a substantial likelihood of irreparable misidentification.'"
 

 Id.
 

 (quoting
 
 State v. Fowler,
 

 353 N.C. 599
 
 , 617,
 
 548 S.E.2d 684
 
 , 698 (2001)). "Show-ups, the practice of showing suspects singly to witnesses for purposes of identification, have been criticized as an identification procedure by both [our State Supreme Court] and the U.S. Supreme Court."
 
 State v. Turner,
 

 305 N.C. 356
 
 , 364,
 
 289 S.E.2d 368
 
 , 373 (1982). This is because, "[t]his identification procedure may be inherently suggestive for the reason that witnesses would be likely to assume that the police presented for their view persons who were suspected of being guilty of the offense under investigation."
 

 Id.
 

 While, however, the "show-up" procedure is both suggestive and unnecessary, it is not
 
 per se
 
 a violation of a defendant's due process rights.
 

 Id.
 

 "The primary evil sought to be avoided is the substantial likelihood of irreparable misidentification."
 

 Id.
 

 Thus, a court's focus in reviewing the constitutionality of a pretrial "show-up" identification should rest on the second part of the analysis outlined in
 
 Johnson
 
 and
 
 Fowler
 
 : whether the procedures created a substantial likelihood of irreparable misidentification.
 
 See Fowler,
 

 353 N.C. at 617
 
 ,
 
 548 S.E.2d at 698
 
 ;
 
 Johnson,
 

 161 N.C. App. at 72
 
 ,
 
 587 S.E.2d at 448
 
 .
 

 In this case, defendant's argument is fundamentally flawed, as Bozarth was unable to identify defendant as one of the robbers. Instead, Bozarth merely identified the jacket found in the taxiwith defendant as the same jacket which Bozarth had seen and felt during the robbery and noted that defendant was the same general height and build as the taller of the two robbers. Thus, under the totality of the circumstances, we conclude that there was no likelihood the use of the "show-up" identification procedure would have resulted in an irreparable misidentification by Bozarth, because Bozarth did not identify defendant.
 

 Nevertheless, even if Bozarth's identification of defendant's coat could some how be imputed to defendant, such that Bozarth's identification of the coat was, in effect, an identification of defendant as the robber, we conclude there was no error in the use of the pretrial identification procedure.
 

 In analyzing whether identification procedures are impermissibly suggestive, North Carolina courts look to various factors including: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty shown by the witness, and the time between the offense and the identification."
 

 Johnson,
 

 161 N.C. App. at 73
 
 ,
 
 587 S.E.2d at 448
 
 (quoting
 
 State v. Rogers,
 

 355 N.C. 420
 
 , 432,
 
 562 S.E.2d 859
 
 , 868 (2002)).
 

 In this case, Bozarth had the opportunity to observe the coat the robber was wearing and to feel it as it brushed against his bare arm. Bozarth's attention was focused on the coat during the robbery, as it was the man in the coat who pointed the gun at him and grabbed for the phone. Further, it was Bozarth's request during the "show-up," to view any clothing defendant might have with him, without any prompting by the police officers that led tohis identification of the coat, which Bozarth immediately identified. Finally, Bozarth's identification of the coat occurred shortly after the Pizza Hut had been robbed and defendant apprehended. Accordingly, we conclude there was no error in admitting evidence obtained from the "show-up" identification procedure against defendant.
 

 II.
 

 Defendant next argues that his statements regarding his whereabouts in response to questioning by Officer Russell were inadmissible. Defendant alleges this is so because the questioning occurred while defendant was in custody in the back seat of Officer Russell's police cruiser and defendant had not been given his
 
 Miranda
 
 rights. The State argues that defendant was, in fact, in the back of the taxi cab during this questioning. Although there appears to have been some confusion as to the chronology of these events, this confusion was resolved by Officer Russell's testimony on re-direct that defendant was questioned about his whereabouts on the evening before being placed in the patrol car and told about the robbery investigation. Thus, taken in context, it is apparent that the questioning occurred while defendant was in the taxi cab and Officer Russell was simply explaining that, based on the alibi defendant had given, he went to the restaurant after the "show-up" to see if the alibi could be verified.
 

 Thus, the issue before us is whether defendant was entitled to
 
 Miranda
 
 warnings prior to questioning as he sat in the taxi cab during a traffic stop. "The [
 
 Miranda
 
 ] warning was conceived toprotect an individual's Fifth Amendment right against self-incrimination in the inherently compelling context of custodial interrogations by police officers."
 
 State v. Buchanan,
 

 353 N.C. 332
 
 , 336,
 
 543 S.E.2d 823
 
 , 826 (2001). "'[I]n determining whether a suspect [is] in custody, an appellate court must examine all the circumstances surrounding the interrogation; but the definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.'"
 
 Id.
 
 at 338,
 
 543 S.E.2d at 828
 
 (quoting
 
 State v. Gaines,
 

 345 N.C. 647
 
 , 662,
 
 483 S.E.2d 396
 
 , 405 (1997)).
 

 In this case, Officer Russell's questioning occurred while he was conducting an on-the-scene investigation following the traffic stop of the taxi.
 
 See State v. Kincaid,
 

 147 N.C. App. 94
 
 , 101-02,
 
 555 S.E.2d 294
 
 , 300 (2001) (neither
 
 Miranda
 
 warnings nor waiver of counsel required when police questioning during a traffic stop was limited to general on-the-scene investigation). Defendant was not under arrest, nor was his freedom of movement restrained to the degree associated with a formal arrest while he was sitting in the back of the taxi cab. Thus, Officer Russell was not required to provide
 
 Miranda
 
 warnings prior to questioning defendant regarding his whereabouts on the evening of the robbery and the trial court did not err in allowing this testimony.
 

 III.
 

 Defendant also argues Officer Russell's testimony that "I just know [defendant] from the past, and once that he remembered who I was . . . he was very cooperative," was inadmissible characterevidence of prior bad acts by defendant. This statement, however, is not evidence that defendant committed prior bad acts, but instead simply shows that defendant and Officer Russell knew each other. Furthermore, this evidence was not used to improperly impeach defendant's credibility but instead explained why defendant cooperated with Officer Russell during his on-the-scene investigation. We therefore reject this assignment of error.
 

 IV.
 

 Defendant finally argues that his motion to dismiss should have been granted as there was not substantial evidence that he was one of the two robbers. We disagree.
 

 "A motion to dismiss is properly denied if `there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense.'"
 
 State v. Wheeler,
 

 138 N.C. App. 163
 
 , 165,
 
 530 S.E.2d 311
 
 , 312 (2000) (citation omitted). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Franklin,
 

 327 N.C. 162
 
 , 171,
 
 393 S.E.2d 781
 
 , 787 (1990). In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, allowing the State the benefit of every reasonable inference derived therefrom.
 
 Wheeler,
 

 138 N.C. App. at 165
 
 ,
 
 530 S.E.2d at 312
 
 .
 

 In this case, the evidence that defendant was one of the robbers includes evidence that defendant was seen running away from the Pizza Hut followed by Anthony Robinson, one of the Pizza Hutmanagers. In addition, the coat worn by the taller of the two robbers was identified as the same one defendant had with him at the time of his apprehension. Furthermore, defendant was of the same general height and build as the taller of the two robbers. Moreover, there was evidence that defendant, wearing the same coat, had been on a dinner date with Dupass, which was interrupted when defendant drove to meet another man with whom he walked off into the woods near the Pizza Hut. Defendant was identified by Officer Morris as one of the men seen running from the Pizza Hut. Further, defendant's alibi that he had spent the evening at a restaurant was proven false. A subsequent search of the wooded path along which defendant had been seen running revealed money and the gun used in the robbery. This is all substantial circumstantial evidence from which a jury could find that defendant committed the robbery and is sufficient to withstand a motion to dismiss.
 

 No error.
 

 Chief Judge MARTIN and Judge TIMMONS-GOODSON concur.
 

 Report per Rule 30(e).
 

 We note that defendant in this appeal does not challenge his identification by Officer Morris during the same "show-up" procedure.